**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **RENEL C. SAMPLE,** | : | **CIVIL ACTION** |
| **Plaintiff,** | : | |
| | : | |
| **v.** | : | **No.: 21-cv-1239** |
| | : | |
| **KIRAN AHUJA, Director, United** | : | |
| **States Office of Personnel Management,** | : | |
| **Defendants.** | : | |

**<u>MEMORANDUM</u>**

**SITARSKI, M.J.**                                           **December 27, 2024**

Renel C. Sample ("Plaintiff") has worked at the United States Office of Personnel Management ("OPM") in the Philadelphia Service Branch since April of 2002. Throughout his employment, he has applied for multiple promotions and only been selected for one. Plaintiff alleges that this is because OPM primarily promotes younger, white females, and Plaintiff is a 60-year-old, African American male. Plaintiff filed a Complaint against Kathleen McGettigan in 2021—then the Acting Director of OPM—alleging the following four claims: (1) age discrimination under the Age Discrimination in Employment Act of 1967 (hereinafter "ADEA") through disparate treatment; (2) race discrimination under Title VII of the Civil Rights Act of 1964 (hereinafter "Title VII") through disparate treatment; (3) gender discrimination under Title VII through disparate treatment; and (4) retaliation under Title VII and the ADEA.

Presently pending before the Court are the motion for summary judgment filed by Kiran Ahuja, the current Director of OPM ("Defendant") (Def.'s Mot. Summ. J., ECF No. 44), the response in opposition to Defendant's motion, filed by Plaintiff (Pl.'s Mem. Law in Opp'n to Def.'s Mot. Summ. J., ECF No. 51) (hereinafter "Resp."), and Defendant's reply brief in further support of its motion (Def.'s Reply in Further Supp. Def.'s Mot. Summ. J., ECF No. 53)

(hereinafter "Reply").  For the reasons that follow, Defendant's Motion for Summary Judgment shall be **GRANTED**.

### I.    FACTS AND PROCEDURAL BACKGROUND[1]

####    A.    Renel C. Sample's OPM Employment History

OPM is a federal agency tasked with providing staffing and human resources services to the federal government.  (Decl. Erika L. Vega, attached as Ex. B to Def.'s Mot. Summ. J., ECF No. 44, at ¶ 1) (hereinafter "Vega Decl.").  OPM is comprised of various "practice areas" and "groups," one of which is the Staff Acquisition Group ("SAG").  (*Id.*, ECF No. 44, at ¶ 4).  SAG conducts hiring for, and provides training to, various federal agencies.  (*Id.*, ECF No. 44, at ¶ 5).  SAG operates through five branches: four service branches located in Philadelphia (PA), San Antonio (TX), Kansas City (MO), and Norfolk (VA), as well as the Project Management Office.  (*Id.*, ECF No. 44, at ¶ 5).  Each branch works on a variety of unique projects for different customers according to their specific needs.  (*Id.*, ECF No. 44, at ¶ 5).  The day-to-day operations of each of the five branches are supervised by a GS-14 Supervisory Human Resources Specialist (commonly known as a "branch manager"), and all four branch managers are supervised by the GS-15 SAG Program Manager.  (*Id.*, ECF No. 44, at ¶ 6; Def.'s Statement Undisp. Mat'l Facts, attached to Def.'s Mot Summ. J., ECF No. 44, at ¶ 7).

Sample began his employment with OPM in April 2002 as a Human Resource Specialist, GS-12 in the Philadelphia branch.  (Decl. Renel C. Sample, attached as Ex. B to Pl.'s Resp. to Def.'s Statement Undisp. Mat'l Facts, ECF No. 52, at ¶ 1) (hereinafter "Sample Decl.").  He was

---

[1]  As required at this stage of the proceeding, the Court views the evidence in the light most favorable to Plaintiff as the non-moving party.  *See, e.g.*, *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587-88 (1986).  Both parties have supplemented the record with various documentation, including declarations from relevant witnesses.

promoted to GS-13 grade in 2007, after he filed a complaint with the Equal Employment Opportunity Commission ("EEOC") alleging that he was being discriminated against and passed over for promotions. (*Id.*, ECF No. 52, at ¶¶ 10, 166-69). Sample thereafter was employed as a "Human Resource Specialist" at OPM "at GS-13 grade in the Philadelphia branch, [with SAG.]" (Compl., ECF No. 1, at ¶¶ 18-19). Sample also filed another EEO complaint in 2011 but ultimately decided "not to pursue the case . . . because [he] thought he would be eligible for other positions." (Sample Decl., ECF No. 52, at ¶¶ 38, 170-72). Sample continued his employment with OPM until January 2022, when he accepted a job offer from the Woodrow Wilson International Center for Scholars as a GS-14 grade Human Resources Specialist. (*Id.*, ECF No. 52, at ¶ 12).

### B.    The Kansas City Position

In March 2018, plaintiff applied for a 120-day detail with the Kansas City office to serve as a temporary branch manager (the "Kansas City position"). (Compl., ECF No. 1, at ¶ 20). Sample was referred for the Kansas City position, but the selection committee did not interview him. The selection committee—which included Erika Vega, the SAG Program Manager[2]—chose not to conduct any interviews and selected Josh Chapman, a Caucasian male under the age of 40, to fill the position. (*Id.*, ECF No. 1, at ¶ 22; Vega Decl., ECF No. 44, at ¶¶ 15, 19-20). At the time, Chapman had only worked at OPM for five years, and according to Sample was "far less qualified than [Sample]" for the position. (Compl., ECF No. 1, at ¶ 24). In her declaration, Vega cited: (1) her personal knowledge of Chapman's work product; (2) Chapman's previous

---

[2]  Vega served as the SAG Program Manager from March 2015 to July 2020. (Vega decl., ECF No. 44, at ¶ 7). As the SAG program manager, Vega served as the direct supervisor over the four branch managers and was ultimately responsible for making selections regarding who would serve as the temporary or permanent branch manager in each office. (Vega Decl., ECF No. 44, at ¶¶ 10-12).

experience working in the Kansas City branch; (3) the fact that Chapman presently resided in Kansas City; and (4) Chapman's experience supervising subordinates during his military service, as her reasons for selecting Chapman.  (Vega Decl., ECF No. 44, at ¶¶ 16, 19-20).

After the selection process was completed, Vega spoke with Sample over the phone in July 2018 and informed him that he had not been selected for the Kansas City position.  (*Id.*, ECF No. 44, at ¶ 24).  Vega "encouraged [Sample] to continue to apply for job opportunities, and [the two] talked about ways [Sample] could demonstrate his leadership qualifications."  (*Id.*, ECF No. 44, at ¶ 24).  Specifically, Vega advised that Sample might "offer[] assistance to the new Philadelphia branch manager, Gloria Garza; . . . help[] train students and lower-graded staff; . . . volunteer[] for higher-level projects; and . . . pursu[e] training or a certification, for which OPM would pay."  (*Id.*, ECF No. 44, at ¶ 24).  After learning that he had not been selected for the Kansas City position, Sample contacted OPM's Equal Employment Opportunity office to lodge an informal complaint of discrimination.  (Compl., ECF No. 1, at ¶¶ 7-13).

### C.    The Temporary Philadelphia Position

During the summer and fall of 2018, Gloria Garza—the branch manager for OPM's Philadelphia office and Sample's immediate supervisor—began taking intermittent periods of leave to tend to a family medical emergency.  (Vega Decl., ECF No. 44, at ¶ 31).  In an effort to cover her frequent absences, Garza "established a weekly rotation of GS-13 employees to fill-in [for her.]"  (*Id.*, ECF No. 44, at ¶ 31).  Sample was one of the GS-13 employees who filled in for Garza and "acted in a supervisory role when [Garza] was out."  (Sample Decl., ECF No. 52, at ¶ 45).  According to Vega, "at around the same time, the Philadelphia branch's largest customer, the National Protection and Programs Directorate ("NPPD"), raised concerns . . . about the timeliness of the branch's performance on NPPD projects."  (Vega Decl., ECF No. 44, at ¶ 31).  This was an issue "of great concern" to Vega.  (*Id.*, ECF No. 44).  It "caused [her] to believe that

the rotation of GS-13 supervisors was not a tenable solution, and that [she] needed to take action to install an acting GS-14 branch manager until Ms. Garza returned on a fulltime basis."  (*Id.*, ECF No. 44).  Vega therefore contacted the Human Resources office at OPM to request that a temporary manager for the Philadelphia branch "be detailed until [] Garza returned [to work]" (the "temporary Philadelphia position").  (*Id.*, ECF No. 44, at ¶ 32).

Based on the "sensitive situation,"[3] Vega ultimately decided to proceed with a "management-directed reassignment" wherein a current employee's job responsibilities are "modif[ied] . . . to include those of another position, within the same agency, and without promoting or demoting the employee."[4]  (*Id.*, ECF No. 44, at ¶ 33).  The representative for OPM's Human Resources office advised Vega to "reassign[] Garza to a non-supervisory GS-14 position within SAG and to reassign another GS-14 supervisor to serve as Philadelphia Branch

---

[3]  According to Vega, the representative from OPM's Human Resources office informed her that Garza "had not invoked the Family and Medical Leave Act, and was planning to return to work as soon as possible."  (Vega Decl., ECF No. 44, at ¶ 32).  The representative further explained that:

> [T]he agency does not permit details of less than 30 days, and that because [] Garza had indicated her intent to return to the office as soon as possible, the timeframe for how long a temporary replacement would be needed was unknown. . . . [F]urther[,] . . . having a family member with a disability is a legally protected characteristic and . . . there could be EEOC implications if [] Garza were moved out of the position.

(*Id.*, ECF No. 44).

[4]  In her declaration, Vega characterizes the decision to proceed with a management-directed reassignment as the Human Resources office's decision.  (*See* Vega Decl., ECF No. 44, at ¶ 33) ("Ultimately, *OPM-HR determined* that a management-directed reassignment was the most appropriate course of action.") (emphasis added).  However, as Vega herself explains, as the SAG Program Manager, she was the official with the final decision-making authority on how to staff the GS-14 branch manager positions.  (*See Id.*, ECF No. 44, at ¶ 6; *see also* Second Suppl. Aff. Vega, attached as Ex. T to Pl.'s Resp. to Def.'s Statement Undisp. Mat'l Facts, ECF No. 52, at 3).

Manager, while continuing to serve in their current role." (*Id.*, ECF No. 44).  According to Vega, "[c]urrent GS-13 employees could not be considered [for the temporary Philadelphia position] because that would entail a promotion, which was not permitted." (*Id.*, ECF No. 44). Therefore, Vega selected Kathy Hidalgo—the San Antonio Branch Manager—for the "dual role" of serving as branch manager for both the San Antonio office and the Philadelphia office. (*Id.*, ECF No. 44, at ¶ 34).  On September 25, 2018, Vega announced to Philadelphia branch staff that Hidalgo would serve as acting manager. (*Id.*, ECF No. 44, at ¶ 33).  On September 28, 2018, Garza unexpectedly announced her decision to retire from OPM, effective October 1, 2018. (*Id.*, ECF No. 44).  Upon learning of Garza's resignation, Vega contacted Hidalgo, who agreed to continue serving in a dual role as branch manager in both the Philadelphia office and the San Antonio office until the hiring process for a new permanent Philadelphia Branch Manager was in place.

Sample thereafter contacted OPM's Equal Employment Opportunity office to amend his discrimination complaint in November of 2018, adding that he had been the victim of illegal discrimination when not given the opportunity to fill in as the temporary branch manager for the Philadelphia office. (Compl., ECF No. 1, at ¶¶ 13, 32-46).

### D.    The Permanent Philadelphia Branch Manager Position

In September 2018, Garza notified Vega that she intended to permanently resign from her position as the Philadelphia branch manager. (Vega Decl., ECF No. 44, at ¶ 35).  On October 1, 2018, Vega directed OPM's Human Resources office to draft a job announcement for the Philadelphia Branch Manager position (the "permanent Philadelphia position"). (*Id.*, ECF No. 44, at ¶¶ 36-37).  On October 12, 2018, the job announcement for the new Philadelphia Branch Manager position was posted online to the USAJOBS website. (*Id.*, ECF No. 44, at ¶ 38).  This position was open for application to the public and to any qualified federal employee under

position number 19-002-GLM-MP.  (*Id.*, ECF No. 44).  Nine qualified applicants, including

Sample, were referred for consideration.  (*Id.*, ECF No. 44).  Vega convened a three-member

panel to review the qualifications of the applicants.  According to Vega, "due to time constraints

and prior commitments" of the panel members, she decided to eliminate several of the applicants

from consideration.  (*Id.*, ECF No. 44, at ¶ 39).  She accomplished this by contacting a

representative from OPM's Human Resources office, inquiring as to the application "scores" of

the nine candidates, and eliminating the candidates who had a "score" lower than 87.  (*Id.*, ECF

No. 44).  Sample was one of the three candidates eliminated from consideration.

The panel thereafter conducted interviews of the six other candidates for the permanent

Philadelphia position in November 2018.  (*Id.*, ECF No. 44, at ¶ 49).  After conducting all

interviews and reviewing the qualifications represented in the applicant pool, Vega determined

that certain qualifications that she believed "were important for the position were

underrepresented among the applicants."  (*Id.*, ECF No. 44).  Specifically, Vega was seeking a

candidate with significant recruitment, hiring, and staffing skills.  (*Id.*, ECF No. 44).  Therefore,

Vega decided to "return the [job announcement] without selection, to revise the job

announcement, and then to re-announce the Philadelphia Branch Manager position under a new

position number."  (*Id.*, ECF No. 44).

Vega advised the Philadelphia branch staff of her decision to return the job

announcement without selection and re-post the position during a staff meeting on January 8,

2019.  (*Id.*, ECF No. 44, at ¶ 50).  Vega advised that she preferred a candidate with a background

in "recruitment and staffing."  (*Id.*, ECF No. 44).  The parties disagree as to whether Sample was

present for this meeting.  Sample maintains that he was present for the meeting, and that he heard

Vega say that there were no "worthy" candidates from the group of applicants.  (Sample Decl.,

ECF No. 52, at ¶¶ 113-14).  Vega maintains that Sample was not present for the meeting, and

also that she never made the statement regarding no "worthy" candidates that Sample attributes to her.  (Vega Decl., ECF No. 44, at ¶¶ 51-52).

Sample contacted OPM's Equal Employment Opportunity office to again amend his complaint, adding that he had been illegally discriminated against when: (1) Vega did not select him for the initial permanent Philadelphia position posting, and (2) stated that there were no "worthy" candidates in the applicant pool.  (Compl., ECF No. 1, at ¶¶ 13, 51-53).

On January 24, 2019, the revised job announcement was posted on the USAJOBS website under position number 19-074-GLM-MP.  (Vega Decl., ECF No. 44, at ¶ 53).  Vega convened the same panel to review the candidates for the position.  Fifteen qualified applicants were referred to the panel for the position, including Sample.  (*Id.*, ECF No. 44, at ¶ 54).  In March 2019, the panel interviewed nine of the candidates, including Sample.  (*Id.*, ECF No. 44, at ¶ 55).  "[S]oon []after," Vega learned that Sample had again amended his EEOC complaint to allege that Vega had illegally discriminated against him and retaliated against him by not selecting Sample for the initial permanent Philadelphia position, as well as the Kansas City position and the temporary Philadelphia position.  (*Id.*, ECF No. 44, at ¶ 56).

According to Vega, the unanimous choice for the position amongst all the panelists was Tamika Williams.  (*Id.*, ECF No. 44, at ¶ 57).  Williams—a black female in her 30s and local to the Philadelphia area[5]—was already a GS-14 federal employee, had substantial supervisory experience, and possessed skills related to recruitment and staffing.  (*Id.*, ECF No. 44, at ¶ 57).  Williams was offered the permanent Philadelphia position, and ultimately accepted the position on April 4, 2019.  (*Id.*, ECF No. 44, at ¶ 58).

---

[5]  Williams was a resident of Williamstown, New Jersey.  (Def.'s Objs. and Supp. Resps. to Pl.'s Interrogs. Directed to Def. (First Set), attached as Ex. D to Def.'s Mot. Summ. J., ECF No. 44, at 5).  This Court takes judicial notice of the fact that Williamstown, New Jersey is within 25 miles of Philadelphia.  Fed. R. Evid. 201.

### E.    The San Antonio Position

Several weeks after Hidalgo undertook to manage both the Philadelphia branch and the San Antonio branch, she let Vega know that she could not handle the demands of managing both branches.  (*Id.*, ECF No. 44, at ¶ 42).  Vega and Hidalgo met to discuss the next steps to take, and ultimately agreed that "it would be less disruptive to keep [Hidalgo] temporarily in the Philadelphia Branch Manager position and remove her from the San Antonio Branch Manager position."  (*Id.*, ECF No. 44).  Thereafter, notwithstanding the fact that Hidalgo was based in San Antonio, Vega directed OPM's Human Resources office to post a 120-day detail for a temporary branch manager position for the San Antonio office (the "San Antonio position").  (*Id.*, ECF No. 44).

Three candidates were referred for the San Antonio position: Christina Ybarra, Rosann Barton, and Sample.  (*Id.*, ECF No. 44, at ¶ 43).  Sample was the only one of the three applicants who did not live in or around San Antonio.  (*Id.*, ECF No. 44, at ¶ 44).  Sample had never worked in the San Antonio branch, and, according to Vega, "was not familiar with the branch's staff, customers, and work."  (*Id.*, ECF No. 44).  Vega convened a panel of three GS-14 supervisors to help her evaluate the candidates, and ultimately selected Barton to fill the role.  (*Id.*, ECF No. 44, at ¶ 45).  According to Vega, the panel unanimously agreed that Barton was the best candidate for the role, based on her prior experience working in the San Antonio office and her familiarity with the branch's staff and customers.  (*Id.*, ECF No. 44).  Moreover, Vega emphasized that Barton had prior experience serving as the acting San Antonio Branch Manager for short periods of time in the past.  (*Id.*, ECF No. 44).

On November 16, 2018, Vega advised Sample that he was not selected for the San Antonio position, and on November 21, 2018, Vega announced the selection of Barton as acting manager for the San Antonio branch.  (*Id.*, ECF No. 44, at ¶¶ 46-47).

9

### F.    Sample's EEO Complaint Proceedings

As noted above, Sample originally contacted OPM's Equal Employment Opportunity office on July 26, 2018, to lodge an informal complaint of illegal discrimination and retaliatory conduct on the part of Vega.  (Def.'s Statement Undisp. Mat'l Facts, ECF No. 44, at ¶¶ 23-24). Sample submitted an EEOC Counseling Intake Form the next day, in which he alleged that his non-selection for the Kansas City position was due to his age, race, and sex, and also constituted retaliation for his prior EEOC participation in 2007 and 2011.  (*Id.*, ECF No. 44, at ¶¶ 27-28).  In her declaration, Vega maintains that she did not know about Sample's prior EEOC filings. (Vega Decl., ECF No. 44, at ¶ 27).  In contrast, Sample maintains in his declaration that Vega "would have known of [his] prior EEO complaints, as [he] was vocal about not accepting OPM's *status quo* of promoting younger white females over someone who was a more experienced, Black older male."  (Sample Decl., ECF No. 52, at ¶ 39) (emphasis in original).

Sample thereafter filed a formal complaint with the EEOC on August 28, 2018.  (Compl., ECF No. 1, at ¶¶ 7, 11; Def.'s Statement Undisp. Mat'l Facts, ECF No. 44, at ¶ 35).  Sample's original EEOC Complaint noted only his non-selection for the Kansas City position as an "Alleged Discriminatory Event."  (OPM Formal EEO Complaint of Renel C. Sample, August 28, 2018, attached as Ex. R to Def.'s Mot. Summ. J., ECF No. 44, at 1) (hereinafter "August 28, 2018, EEO Complaint").  Sample identified his race ("African American"), color ("Black"), sex ("Male"), and age ("date of birth July 5, 1964 - [age] 54") as the "Bas[es] of Discrimination," and also noted his "prior EEO [conduct]" as the impetus for Vega's "Retaliation."  (*Id.*, ECF No. 44, at 1).  On October 9, 2018, OPM authorized EEOC Investigator Latisha Thomas to investigate Sample's formal EEOC complaint.  (Def.'s Statement Undisp. Mat'l Facts, ECF No. 44, at ¶ 47).

Sample again contacted OPM's Equal Employment Opportunity office in October 2018

regarding Vega's selection of Hidalgo for the temporary Philadelphia position, and his inability

to be considered for that temporary post.  Sample amended his formal EEOC complaint to

include this additional issue on November 5, 2018, again citing his race, color, sex, age, and

retaliation as bases of discrimination against him.  (*Id.*, ECF No. 44, at ¶ 49; Am. Acceptance

Letter, EEO Compl. of Renel C. Sample, attached as Ex. BB to Def.'s Mot. Summ. J., ECF No.

44, at 1-2).

On February 5, Sample again contacted OPM's Equal Employment Opportunity office to

amend his formal EEOC complaint, this time claiming that he was the victim of race, age, and

sex discrimination, as well as retaliation, when: (1) he was not selected for the initial permanent

Philadelphia position; (2) Vega stated that there were no "worthy" candidates in the applicant

pool; and (3) Vega did not fill the initial permanent Philadelphia position, instead re-announcing

the position weeks later.  (Def.'s Statement Undisp. Mat'l Facts, ECF No. 44, at ¶ 67; Second

Am. Acceptance Letter, EEO Compl. of Renel C. Sample, attached as Ex. KK to Def.'s Mot.

Summ. J., ECF No. 44, at 1-2).  All of these amendments to his complaint were accepted.  The

amended formal EEOC complaint contained the following five claims:

> Claim 1: On July 24, 2018, complainant learned he was not
> selected for the 120-day detail/temporary promotion as the GS-
> 0201-14 Supervisory HR Specialist/Midwest Branch Manager in
> Kansas City, MO with OPM/Human Resources (HRS);
>
> Claim 2: On September 25, 2018, complainant was not provided
> the opportunity to apply for the [temporary] Philadelphia Branch
> Manager position because the Agency named a Caucasian female
> manager from the San Antonio office as acting supervisor instead
> of advertising the position as a detail;
>
> Claim 3: On January 8, 2019, complainant learned he was not
> selected for the Supervisory HR Specialist Position, 19-002-GLM-
> MP, in Philadelphia with OPM/Human Resources Solutions
> (HRS), because the agency decided not to fill the vacancy from
> that announcement;

> Claim 4: On January 8, 2019, the selecting office announced they had closed the vacancy for Supervisory HR Specialist Position, 19-002-GLM-MP, because there were no "worthy candidates";
>
> Claim 5: On January 24, 2019, complainant learned the Supervisory HR Specialist Position 19-002-GLM-MP, was re-announced as 19-074-GLM-MP with no apparent changes to the announcement.

(Compl., ECF No. 1, at ¶ 13).

On March 28, 2019, Thomas issued her Report of Investigation ("ROI") regarding Sample's formal EEOC complaint. (Def.'s Statement Undisp. Mat'l Facts, ECF No. 44, at ¶ 73). The case then came before Administrative Law Judge ("ALJ") Dawn M. Edge under EEOC Hearing No. 530-2020-00008X. (Def.'s Statement Undisp. Mat'l Facts, ECF No. 44, at ¶ 73; Scheduling Order Mot. to Amend, attached as Ex. OO to Def.'s Mot. Summ. J., ECF No. 44). On June 16, 2020, Sample filed a motion to amend his formal complaint a third time, seeking to include five new instances of illegal discrimination and retaliation against himself:

> Proposed New Claim 1: On or about November 21, 2018, Complainant was not selected for the San Antonio position;
>
> Proposed New Claim 2: Complainant was not selected for the re-announced Philadelphia Branch Manager position;
>
> Proposed New Claim 3: On or about January 5, 2019, Complainant was charged five hours AWOL;
>
> Proposed New Claim 4: On or about May 2019, Supervisor Tamika Williams issued Complainant a letter of reprimand; and
>
> Proposed New Claim 5: In or about August 2019, Complainant's request for FMLA was properly designated as sick leave.

(Def.'s Statement Undisp. Mat'l Facts, ECF No. 44, at ¶ 75).

On August 14, 2020, the ALJ entered an order allowing the additional claim that OPM retaliated against Sample when he was not selected for the permanent Supervisory HR Specialist position (19-074-GLM-MP) located in Philadelphia; this became the sixth claim in Sample's

formal EEOC complaint.  (Order Ruling on Complainant's Mot. to Amend Accepted Issue and

Denying Complainant's Req. for Enlarged Disc., attached as Ex. PP to Def.'s Mot. Summ. J.,

ECF No. 44) (hereinafter "August 14, 2020, EEOC Order").  The ALJ did not accept the other

four proposed amendments to Sample's claim, specifically finding that the claim related to

Sample's non-selection for the San Antonio position was a "new claim[] and not like or related

to the original complaint, nor possibly could have reasonably been expected to grow out of the

original complain[t] during investigation."  (*Id.*, ECF No. 44, at 3).

Notwithstanding that the ALJ accepted the sixth "issue" and undertook to review

Sample's case, the ALJ failed to act on Sample's formal EEOC complaint within 180 days, after

which, on March 15, 2021, Sample filed a Complaint in this Court asserting three claims of

illegal age, race, and sex discrimination as well as one claim of illegal retaliation by OPM—by

and through its officers, agents, servants, and employees—in violation of the ADEA and Title

VII.  (Compl., ECF No. 1, at ¶¶ 17, 66-134).

### G.    The Parties' Pleadings in this Court

Sample alleges in his Complaint that during the relevant time period, OPM had a "*status

quo* of promoting younger white females over someone who was a more experienced, Black

older male."  (*Id.*, ECF No. 1, at ¶ 28) (emphasis in original).  Sample noted several examples of

younger female employees at OPM who, after being personally trained by Sample, were selected

for promotions over him, including Erika Vega—the SAG Program Manager—and Janine

Beatty—who served in a leadership position within OPM, sat on several of the hiring panels

convened by Vega during the relevant time period, and was promoted to the position vacated by

Vega after her departure.  (*Id.*, ECF No. 1, at ¶¶ 25-26, 64).  Sample maintains that, pursuant to

this practice of promoting younger, mostly white females through the ranks of OPM, he was

passed over for promotion to the aforementioned positions because of his age, race, and sex.

(*See generally Id.*, ECF No. 1).  He also cites his EEOC participation in 2018 as the basis of his retaliation claim.  (*Id.*, ECF No. 1, at ¶¶ 120-34).[6]

Sample concedes that he cannot point to any direct evidence of discrimination and therefore relies on the disparate treatment that he endured while employed at OPM to substantiate his claims, citing the "familiar *McDonnell Douglas* burden-shifting" approach.  (*See* Resp., ECF No. 51, at 19-21 (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973))).  Under that framework, Sample bears the initial burden of establishing a prima facie case of discrimination.  *Daniels v. Sch. Dist. of Phila.*, 776 F.3d 181, 193 (3d Cir. 2015).  This burden requires Sample to first demonstrate that:

> (1) []he is a member of a protected class; (2) []he was qualified for the position []he sought to attain or retain; (3) []he suffered an adverse employment action; and (4) the action occurred under circumstances that could give rise to an inference of intentional discrimination.

*Makky v. Chertoff*, 541 F.3d 205, 214 (3d Cir. 2008) (citing *McDonnell Douglas*, 411 U.S. at 802); *see also Sheridan v. E.I. DuPont de Nemours & Co.*, 100 F.3d 1061, 1066 n.5 (3d Cir.1996) (en banc).

In his Complaint and other supplemental pleadings filed with this Court, Sample points to several factors and key pieces of circumstantial evidence to support his allegations of age, race, and sex discrimination:

(1) the selecting officials were all under 40 years old, and all of the relevant hiring

---

[6] Of note, while Sample initially pursued claims of retaliation related to his prior EEOC participation in 2007 and 2011 at the administrative level, he has abandoned those claims in this Court.  (*See generally* Compl., ECF No. 1).  His claim of retaliation (Count IV) is premised solely on his EEOC participation in 2018 and his non-selection for the permanent Philadelphia position.  (*Id.*, ECF No. 1, at ¶¶ 121-23, 127-34; *see also* Resp., ECF No. 51, at 5 ("Plaintiff's retaliation claim is confined only to the opening, then closing, then opening and non-selection for the 19-002 and 19-074 positions.")).

selections were under 40 years old (Compl., ECF No. 1, at ¶¶ 71-72);

(2) the selected applicants were either female (Tamika Williams, Kathy Hidalgo, and Rosann Barton) or white (Josh Chapman, Rosann Barton) (*Id.*, ECF No. 1, at ¶¶ 22, 35, 41, 60);

(3) as the hiring official in charge of each of the relevant selections, Vega was inconsistent in her preference for local applicants (Sample Decl., ECF No. 52, at ¶¶ 23-29);

(4) Vega was also inconsistent in her own opinion as to what qualifications were sufficient for the various managerial positions, and whether Sample met those qualifications (Compl., ECF No. 1, at ¶¶ 46, 49, 52-53, 58-59; Vega Decl., ECF No. 44, at ¶¶ 10, 15-18, 33, 39);

(5) Vega's "unusual" decision to continue to have Hidalgo fly from San Antonio to Philadelphia two days per week—notwithstanding the fact that Hidalgo was located in San Antonio—and open a separate, temporary managerial detail in San Antonio instead of Philadelphia (Vega Decl., ECF No. 44, at ¶¶ 42-43; Aff. Jeffrey Carter, attached as Ex. P to Pl.'s Resp. to Def.'s Statement Undisp. Mat'l Facts, ECF No. 52, at ¶¶ 2-6; Aff. Peter Alfieri, attached as Ex. Q to Pl.'s Resp. to Def.'s Statement Undisp. Mat'l Facts, ECF No. 52, at ¶¶ 3-5); and

(6) Vega's continued practice of hiring less-qualified applicants over Sample (Compl., ECF No. 1, at ¶ 62).

Moreover, in making his case for retaliation, Sample points to the aforementioned factors, as well as the temporal proximity between when Vega learned of Sample's EEOC complaint against her and his non-selection for the permanent Philadelphia position. (*Id.*, ECF No. 1, at ¶¶ 129-30).

At the outset of this case, Defendant filed a motion to dismiss in this Court, arguing that Sample had not adequately stated a claim upon which relief could be granted. (Partial Mot. Dismiss or, in the Alternative, Partial Summ. J., ECF No. 5). The District Court Judge, Hon. C.

Darnell Jones II, denied Defendant's motion.  (Memorandum of Feb. 17, 2022, ECF No. 14).

However, in doing so, Judge Jones also clarified certain aspects of Sample's case, ruling that:

(1) with respect to the Kansas City position, Sample "could not possibly allege sex discrimination related to this position because both [Sample] and Chapman are males," and therefore Sample could not have been treated differently based on his sex.  (*Id.*, ECF No. 14, at 15-16);

(2) with respect to the permanent Philadelphia position, because Vega did not fill the initial job posting, "any claim that [Vega's decision to not to fill the role initially] constitutes discrimination based upon sex, gender, or age fails because [Sample] cannot identify how a person outside Plaintiff's protected class was treated more favorably." (*Id.*, ECF No. 14, at 16); and

(3) again, with respect to the permanent Philadelphia position, "a claim of race discrimination would be unfruitful" because the selectee, Tamika Williams, was an African American, and therefore Sample could not have been treated differently based on his race.  (*Id.*, ECF No. 14, at 17).

The parties thereafter consented to the referral of this case to a magistrate judge of this Court.  (Notice, Consent, and Reference of a Civ. Action to Magistrate Judge, ECF No. 21; 28 U.S.C. § 636(c); Fed. R. Civ. P. 73).  This Court now turns to Defendant's instant motion for summary judgment.

## II.    LEGAL STANDARD

Summary judgment shall be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  A fact is "material" if it "might affect the outcome of the suit under the governing law."

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  An issue is "genuine" if there is

sufficient evidence from which a reasonable jury could find in favor of the non-moving party.

*Id.*  It is not the Court's role to weigh the disputed evidence and decide which is more probative

or to make credibility determinations.  Rather, the Court must consider the evidence, and all

reasonable inferences which may be drawn from it, in the light most favorable to the non-moving

party.  *See, e.g.*, *Matsushita Elec. Indus. Co.,* 475 U.S. at 587-88; *Tigg Corp. v. Dow Corning

Corp.*, 822 F.2d 358, 361 (3d Cir. 1987).  If a conflict arises between the evidence presented by

both sides, the Court must accept as true the evidence adduced by the non-moving party, and "all

justifiable inferences are to be drawn in his favor."  *Anderson*, 477 U.S. at 255 (citing *Adickes v.

S.H. Kress Co.*, 398 U.S. 144, 158-59 (1970)).

The moving party bears the initial burden of demonstrating that there is no genuine issue

of material fact.  *See, e.g.*, *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-24 (1986).  Once the

moving party carries this initial burden, the non-moving party must come forward with specific

facts showing there is a genuine issue for trial.  *See, e.g.*, *Anderson*, 477 U.S. at 256-57;

*Matsushita Elec. Indus. Co.*, 475 U.S. at 587.  The non-moving party thereby must present

something more than mere allegations, general denials, vague statements, or suspicions in order

to defeat a properly supported motion for summary judgment.  *See, e.g.*, *Trap Rock Indus., Inc. v.

Local 825, Int'l Union of Operating Eng'rs*, 982 F.2d 884, 890 (3d Cir. 1992); *Fireman's Ins.

Co. of Newark v. DuFresne*, 676 F.2d 965, 969 (3d Cir. 1982).  "If the evidence is merely

colorable, or is not significantly probative, summary judgment may be granted."  *Anderson*, 477

U.S. at 249-50 (citing *Dombrowski v. Eastland*, 387 U.S. 82 (1967) (per curiam); *First Nat'l

Bank of Ariz. v. Cities Serv. Co.*, 391 U.S. 253, 290 (1968)).

## III.    DISCUSSION

As an initial matter, Defendant first argues that two of Sample's discrimination claims as well as his retaliation claim are not properly before this Court, as Sample failed to administratively exhaust those claims.  (Def.'s Mot. Summ. J., ECF No. 44, at 9-17).[7]  Defendant next argues that Sample has not produced any documentation to substantiate his allegations of discrimination or retaliation, that his claims are "conclusory," and that the record—or lack thereof—before this Court is insufficient "to defeat summary judgment."  (*Id.*, ECF 44, at 2 (quoting *Kirleis v. Dickie, McCamey & Chilcote, P.C.*, 560 F.3d 156, 161 (3d Cir. 2009))).[8]  Defendant takes issue with Sample's ability to meet his initial burden of production to make out a *prima facie* case of discrimination or retaliation, as well as Sample's ability to produce any evidence that might rebut Defendant's legitimate, nondiscriminatory reasons for not selecting Sample for the relevant positions.  (*Id.*, ECF No. 44, at 17-36).  Finally, Defendant argues that even if Sample's claims survive summary judgment, "Sample cannot prove that he suffered any damages related to any alleged discrimination or retaliation."[9]  (*Id.*, ECF No. 44, at 36-37).

### A.    Administrative Exhaustion of Sample's Claims

Defendant argues that Sample failed to administratively exhaust three of his "claims" below—(1) his non-selection for the San Antonio Position; (2) his non-selection for the

---

[7]  Both parties frame Sample's "claims" in terms of the different "positions" that he was not selected for (e.g., the "Kansas City position," the "temporary Philadelphia position," etc.) notwithstanding the fact that his "claims" in this Court are actually claims of "discrimination" and "retaliation" under the ADEA and Title VII.  As such, this Court will do the same throughout this memorandum opinion.

[8]  As the *Kirleis* Court noted, "conclusory, self-serving affidavits are insufficient to withstand a motion for summary judgment."  *Id.* at 161 (quoting *Blair v. Scott Specialty Gases*, 283 F.3d 595, 608 (3d Cir. 2002)).

[9]  Because this Court disposes of Defendant's motion on other grounds, *infra*, Defendant's arguments regarding Sample's ability to prove damages will not be addressed.

permanent Philadelphia position; and (3) his claim of retaliation predicated on his EEOC participation between 2018-2020—and therefore is barred from pursuing redress based on any conduct or injury related to these claims.  This Court disagrees.

"It is a basic tenet of administrative law that a plaintiff must exhaust all required administrative remedies before bringing a claim for judicial relief."  *Robinson v. Dalton*, 107 F.3d 1018, 1020 (3d Cir. 1997) (citing *McKart v. United States*, 395 U.S. 185, 193 (1969)).  Thus, "when Title VII remedies are [administratively] available, they must be exhausted before a plaintiff may file suit."  *Spence v. Straw*, 54 F.3d 196, 200 (3d Cir. 1995).  "These pre-suit requirements, which include the step of filing a charge . . . [with] the EEOC, are 'essential parts of the statutory plan, designed to correct discrimination through administrative conciliation and persuasion if possible, rather than by formal court action.'"  *Simko v. United States Steel Corp*, 992 F.3d 198, 206-07 (3d Cir. 2021) (quoting *Ostapowicz v. Johnson Bronze Co.*, 541 F.2d 394, 398 (3d Cir. 1976)); *see also Anjelino v. New York Times Co.*, 200 F.3d 73, 94 (3d Cir. 1999) ("[T]he purpose of the filing requirement is to enable the EEOC to investigate and, if cause is found, to attempt to use informal means to reach a settlement of the dispute." (citing *Hicks v. ABT Assoc. Inc.*, 572 F.2d 960, 963 (3d Cir.1978))).  "The Supreme Court has also emphasized that a fundamental aim of the pre-suit requirements is to 'give prompt notice to the employer' and 'encourage the prompt processing of all charges of employment discrimination.'"  *Simko*, 992 F.3d at 207 (quoting *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 109 (2002)).

"Courts have generally determined that the parameters of the civil action in the district court are defined by the scope of the EEOC investigation which can reasonably be expected to grow out of the charge of discrimination."  *Ostapowicz*, 541 F.2d at 398-99 (citing *Gamble v. Birmingham Southern R.R. Co.*, 514 F.2d 678 (5th Cir. 1975)).  This may include "new acts which occurred during the pendency of proceedings before the Commission."  *Id.* at 399 (citing

*Oubichon v. North American Rockwell Corp.*, 482 F.2d 569 (9th Cir. 1973)).

The Third Circuit, in *Simko*, provided a helpful framework for engaging in this analysis:

> In comparing the two sets of allegations, we look for factual
> similarities or connections between the events described in the
> claims, the actors involved, and the nature of the employer conduct
> at issue. . . . Such factual overlap alone, however, does not
> guarantee that the new allegations are encompassed by the original
> charge if they do not fall within the "gravamen" of the initial
> charge. . . . But even if we find no factual nexus, we may also
> consider whether the two sets of allegations advance the same
> theory of discrimination . . . .

*Id.* at 211 (citations omitted).

Applying this framework to Sample's claims regarding both the San Antonio position and the permanent Philadelphia position, it is clear that both new claims could reasonably have been expected to grow out of the original investigation, and therefore survive exhaustion requirements.

Regarding Sample's non-selection for the San Antonio and permanent Philadelphia positions, Defendant maintains that because the EEOC investigation closed before Sample attempted to amend his formal EEOC complaint to include these claims, Sample failed to exhaust his claims and is therefore foreclosed from pursing any redress in this Court. (Reply, ECF No. 53, at 30). In response, Sample argues that, though these claims may not have been formally in front of the EEOC investigator, his claims nevertheless survive because the facts alleged in the subsequent Title VII actions regarding the San Antonio and permanent Philadelphia positions are fairly within the scope of the prior EEOC complaint or the investigation arising therefrom. (Resp., ECF No. 51, at 8, 11-19 (citing *Antol v. Perry*, 82 F.3d 1291, 1295 (3rd Cir.1996))). This Court agrees with Sample.

It is undisputed that the EEOC investigation closed before Sample sought to amend his complaint to include his non-selection for the San Antonio and permanent Philadelphia positions.

Due to this, the ALJ rejected Sample's request to thereafter include any claims related to his non-selection for the San Antonio position, though the ALJ accepted his claim pertaining to his non-selection for the permanent Philadelphia position.

The relevant test in instances like these is whether the facts that make up Sample's claims related to the San Antonio position and the permanent Philadelphia position fall fairly within the investigation arising from the initial EEOC charge. *See Simko*, 992 F.3d at 207 ("The 'relevant test' for determining whether a later claim needs to be exhausted despite the filing of a previous charge is a two-pronged inquiry into whether 'the acts alleged in the subsequent . . . suit are fairly within the scope of (1) the prior EEOC complaint, or (2) the investigation arising therefrom.'") (quoting *Waiters v. Parsons*, 729 F.2d 233, 237 (3d Cir. 1984)).

Here, Sample's claims pertaining to the permanent Philadelphia position and the San Antonio position are factually similar to his original claims pertaining to the Kansas City position and the temporary Philadelphia position. Specifically, the relevant actors are the same[10] and the nature of the alleged employer conduct is similar. Further, the gravamen of the claims is the same.[11] Lastly, the theory of discrimination advanced by Sample is uniform throughout each

---

[10]  In looking to the relevant actors in each of the claims, Vega was the SAG program manager with the hiring authority for each position during the relevant timeframe for all of Sample's claims. Though she may have convened several interview panels with differing individuals involved, Vega was the common denominator throughout, always retaining the power to select the hire. Moreover, Sample cites two other women—Janine Beatty and Kathy Hidalgo—who also played a part in making the various hiring selections at issue in this case. Hidalgo also played a role in helping Vega to decide to open a temporary detail in her home office of San Antonio instead of the Philadelphia office.

[11]  The types of claims advanced by Sample, and the gravamen of those claims, are similar. As noted above, Sample's claim pertaining to the Kansas City position cannot lawfully state a claim based on sex discrimination. However, Sample does state claims based on age discrimination and race discrimination regarding his non-selection for the Kansas City position. Moreover, Sample stated claims for race, and sex discrimination regarding his non-selection for the temporary Philadelphia position. In looking to the nature of Sample's new claims, he also alleges age, race, and sex discrimination for his non-selection for the San Antonio position, and

of his claims.

Regarding Sample's claim of retaliatory conduct based on his protected EEOC activity during the pendency of this case (2018-2020), it is clear from several of Sample's claims that both OPM and the EEOC investigator were on notice that his non-selection for the permanent Philadelphia position was at issue.  *See Simko*, 992 F.3d at 215-16 (emphasizing that the purpose of administrative exhaustion requirements in discrimination claims is to give notice to the employer); *see also Gooding v. Warner–Lambert Co.*, 744 F.2d 354, 357-59 (3d Cir.1984) (eschewing "highly technical pleading rules, which only serve to trap the unwary practitioner," in favor of notice pleading; reversing dismissal of Title VII action where second right-to-sue letter issued after complaint filed).  In his third and fourth amended claims in his formal EEOC complaint, Sample alleged that he was illegally discriminated against when Vega chose not to select him for the initial permanent Philadelphia position job posting, and when she further implied that he was not a "worthy" candidate.  Though these acts do not give rise to a separate legal claim for discrimination (for the reasons noted above), they certainly help illustrate the nature of Sample's claims pertaining to the permanent Philadelphia position, and that that position was *at issue*.  Moreover, though he ultimately abandoned his claims of retaliation based on his 2007 and 2011 EEOC participation, he continued to advance a theory of retaliation (accepted by the Administrative Judge) predicated on his 2018 EEOC participation.  Therefore, his claim of retaliation regarding the permanent Philadelphia position could reasonably be expected to have grown out of the initial EEOC investigation.

For the foregoing reasons, each of the claims meets exhaustion requirements.  Having

---

he adequately alleges both age and sex discrimination for his non-selection for the permanent Philadelphia position.  All of these claims are further colored by Sample's allegation that OPM has a history and culture of promoting younger, mostly white females over more-experienced, black males such as himself.

determined as much, this Court now turns to the merits of each of Sample's claims, and whether they survive Defendant's motion for summary judgment.

### B.    Sample's Discrimination Claims

Sample advances a claim of age discrimination in violation of the ADEA, and claims of race, and sex discrimination in violation of Title VII, based on his non-selection for the Kansas City position, the temporary and permanent Philadelphia positions, and the San Antonio position. As noted above, under the *McDonnell Douglas* burden-shifting framework for discrimination cases predicated on disparate treatment, Sample has the initial burden to demonstrate that (1) he is a member of a protected class; (2) he was qualified for the positions he sought to attain; (3) he suffered adverse employment actions; and (4) the actions occurred under circumstances that could give rise to an inference of intentional discrimination. *Makky*, 541 F.3d at 214. The burden of production then shifts to Defendant to articulate a legitimate, nondiscriminatory rationale for the adverse employment action. *See Tomasso v. Boeing*, 445 F.3d 702, 706 (3d Cir. 2006) (citing *Fuentes v. Perskie*, 32 F.3d 759, 763 (3d Cir.1994)). Defendant's burden in this regard is "'relatively light,' and the employer need only 'introduc[e] evidence which, taken as true, would permit the conclusion that there was a nondiscriminatory reason for the unfavorable employment decision.'" *Id.* (quoting *Fuentes*, 32 F.3d at 763) (alteration in original).

"Once [Defendant] articulates a nondiscriminatory reason, [Plaintiff] must respond by citing evidence that the rationale is pretextual." *Id.* (citing *Fuentes*, 32 F.3d at 763). "In order to create a genuine issue of material fact as to whether the proffered reasons are pretextual, [Plaintiff] must 'point to some evidence, direct or circumstantial, from which a factfinder could reasonably either (1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action.'" *Id.* (quoting *Fuentes*, 32 F.3d at 764). Plaintiff "must do more than

show that [Defendant] was 'wrong or mistaken' in deciding [not to select him for any of the noted positions.]" *Id.* (quoting Fuentes, 32 F.3d at 765). "He must 'present evidence contradicting the *core facts* put forward by the employer as the legitimate reason for its decision.'" *Id.* (quoting *Kautz v. Met–Pro Corp.*, 412 F.3d 463, 467 (3d Cir.2005)) (emphasis in original). "In other words, [Plaintiff] must 'demonstrate such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them "unworthy of credence," and hence infer "that the employer did not act for [the asserted] non-discriminatory reasons."'" *Id.* (quoting *Fuentes*, 32 F.3d at 765) (second alteration in original).

### 1.    Sample's Prima Facie Case

Sample has presented a *prima facie* case of discrimination based on his age, sex, and race. As a black male over 40 years of age, Sample is a member of a protected class.[12] He was qualified for all four of the positions he sought based on his own declarations regarding his qualifications, as well as Vega's concessions on the point.[13] He suffered an adverse employment

---

[12] The ADEA protects individuals over 40 years of age from discrimination based on their age. 29 U.S.C. § 631. Moreover, "Title VII's prohibition of discrimination 'because of . . . sex' protects men as well as women." *Oncale v. Sundowner Offshore Services, Inc.*, 523 U.S. 75, 78 (1998) (quoting *Newport News Shipbuilding & Dry Dock Co. v. EEOC*, 462 U.S. 669, 682 (1983)).

[13] In her declarations, Vega agreed that Sample was a valued employee and asset to OPM during his time there, and was qualified for all of the relevant positions save for the temporary Philadelphia position. Though Defendant (and Vega) maintain that Sample was not qualified for the temporary Philadelphia position, Sample had previously managed the Philadelphia branch and he and other long-tenured OPM employees (Jeffrey Carter and Peter Alfieri) state that Vega's decision to fly in another GS-14 manager from halfway across the country was an unusual decision and not in keeping with OPM's typical practice in that scenario. Sample contends that these circumstances give rise to the inference that Vega's decision on this point was merely pretext to hide a discriminatory animus on her part. To the extent that OPM maintains that Sample was not qualified for the temporary Philadelphia position because Vega wanted to appoint a pre-existing GS-14 branch manager, that argument is more appropriately evaluated at the second and third stages of the *McDonnell Douglas* burden-shifting framework.

action when he was not selected for each of the positions.[14]  And the circumstances surrounding his non-selection for each of the positions give rise to the inference of intentional discrimination.

### 2. Defendant's Legitimate, Nondiscriminatory Reasons, and Sample's Response

Defendant maintains that Sample's non-selection for the relevant positions was not motivated by discriminatory animus, but rather was the result of other more-qualified applicants who fit OPM's hiring preferences better.  (*See generally* Def.'s Mot. Summ. J., ECF No. 44; *see also* Reply, ECF No. 53).  As the SAG Program Manager, Vega maintained that she preferred candidates local to the specific branches.  (*See* Vega Decl., ECF No. 44, at ¶ 13 (noting Vega's "strong preference" for local candidates who had familiarity with the branch)).  This preference accounted for her selections for the Kansas City position and the San Antonio position.  Both Chapman and Barton had previously worked in the Kansas City and San Antonio offices, respectively, and had familiarity with the office staff and local projects.  To the extent that she did not select a local candidate for the temporary Philadelphia position—i.e., Sample himself— Vega maintained that that was a unique situation, based on her concerns related to NPPD.  (*Id.*, ECF No. 44, at ¶¶ 31-34); *see also Carr v. New York City Transit Authority*, 76 F.4th 172, 177 (2d Cir. 2023) ("While 'entirely ignor[ing]' explicit hiring criteria or an 'unprecedented'

---

*See Ezold v. Wolf, Block, Schorr and Solis-Cohen*, 983 F.2d 509, 523 (3d Cir. 1992) ("In Title VII cases involving a dispute over 'subjective' qualifications, we have recognized that the qualification issue should often be resolved in the second and third stages of the *McDonnell Douglas/Burdine* analysis, to avoid putting too onerous a burden on the plaintiff in establishing a prima facie case.") (quoting *Fowle v. C & C Cola*, 868 F.2d 59, 64 (3d Cir.1989)).

[14]  To the extent that Defendant argues Sample did not suffer an adverse employment action when he was not selected for any of the positions, this Court rejects that contention.  As Judge Jones noted in the prior order denying Defendant's motion to dismiss, temporarily promoting from a GS-13 to a GS-14 grade would have resulted in an increase in salary for Sample, which is sufficient to satisfy the third element of Sample's *prima facie* case. (Memorandum of Feb. 17, 2022, ECF No. 14, at 12-14).

departure from an employer's established hiring practice can show pretext, . . . allegations regarding minor variations in the hiring process and the emphasis on the other candidates' technical backgrounds are not the sorts of 'departures from procedural regularity' that could allow a jury to infer pretext.") (alterations in original) (quoting *Stern v. Trustees of Columbia Univ.*, 131 F.3d 305, 310, 314 (2d Cir. 1997)).  "Where, as here, 'an employer's explanation, offered in clear and specific terms, is reasonably attributable to an honest . . . evaluation of qualifications, no inference of discrimination can be drawn.'"  *Carr*, 76 F. 4th at 177-78 (quoting *Byrnie v. Town of Cromwell, Bd. of Educ.*, 243 F.3d 93, 105 (2d Cir. 2001) (alteration in original)).  As for the permanent Philadelphia position, Defendant emphasizes that all members of the interview panel agreed that Tamika Williams was the best candidate for the position. (Vega Decl., ECF No. 44, at ¶ 57); *Glaesener v. Port Auth. New York and New Jersey*, __ F. 4th __, 2024 WL 4746585, at *2 (3d Cir. Nov. 12, 2024) (affirming a district court's grant of summary judgment where "[t]he successful candidate . . . scored best in the interview [and] . . . [t]here [was] no evidence of [discriminatory animus]" in the interview process); *Johnson v. Nicholson*, 349 Fed. App'x 604 (2d Cir. 2009) (affirming a district court's grant of summary judgment where the employer convened an eight-member panel, engaged in a lengthy evaluation process to rank the candidates, and ultimately ranked the plaintiff seventh out of eleven candidates).

These reasons are sufficient to satisfy Defendant's burden at the second step of the *McDonnell Douglas* analytical framework.  *See Tomasso*, 445 F.3d at 706 (holding that the defendant's burden in this regard is "'relatively light,' and the employer need only 'introduc[e] evidence which, taken as true, would permit the conclusion that there was a nondiscriminatory reason for the unfavorable employment decision'") (quoting *Fuentes*, 32 F.3d at 763) (alteration in original).

Sample is unable to sufficiently rebut Defendant's legitimate, nondiscriminatory reasons for his non-selection. Sample makes several arguments in response to Defendant's evidence in an attempt to show pretext—each of them unavailing. Sample's arguments can be grouped into two categories: (1) OPM generally has a demonstrated culture of hiring and promoting younger, mostly white women over other candidates; and (2) Vega was inconsistent[15] in her estimation of certain "qualifications," and her application of her location "preference."

To the extent that Sample argues that OPM has had a consistent practice of promoting younger, white females over older, more-qualified black men (Compl., ECF No. 1, at ¶ 28), Sample has simply failed to adduce sufficient evidence to support this claim. This Court notes that, of the four candidates actually selected by Vega, only one falls within the "younger white female" category—Rosann Barton. In fact, each of the other three candidates selected share a protected demographic status with Sample.[16] The fact that all of the candidates selected were either female or white does nothing to support Sample's contention on this point, as the collection of hires demonstrates that OPM did, indeed, place black people (Williams), males (Chapman), and older individuals (Hidalgo) in positions of leadership. *See Angioletti v. Chao*, 720 Fed. App'x 41, 47 (2d Cir. 2017) (noting that the fact that plaintiff was "replaced by a [member of the same sex], cast[] . . . doubt on her [sex discrimination] claim"). Sample's contention that each of the hires was under 40 years old also misses the mark, as it ignores the fact that Hidalgo was chosen for the temporary Philadelphia position. Moreover, the fact that

---

[15] *See Farrell v. Planters Lifesavers Co.*, 206 F.3d 271, 280-81, 286 (3rd Cir.2000) (holding that "inconsistencies" in an employer's "explanation" of its actions may create an inference of discrimination).

[16] Tamika Williams identifies as Black, Josh Chapman identifies as male, and Kathy Hidalgo was born in the same year as Sample.

Sample was more senior to the applicants selected over him is not sufficient, by itself, to create

an inference of discrimination.  *See Glaesener*, 2024 WL 4746585, at *2 (notwithstanding that

the plaintiff had more seniority than the selected candidates, absent proof of a discriminatory

culture or animus on the part of the employer, courts will not presume that the decision not to

select plaintiff was motivated by any such animus).  Finally, Sample simply does not support his

contention that each member of the various hiring committees was under 40 years old with any

evidence in the record.[17]  Sample's bald assertion—both in his declarations and in his brief—that

OPM has had a practice or culture of favoring younger white women is insufficient to survive

summary judgment.  *See Kirleis*, 560 F.3d at 161 ("[C]onclusory, self-serving affidavits are

insufficient to withstand a motion for summary judgment.") (quoting *Blair*, 283 F.3d at 608).

Sample next attempts to show pretext by pointing to Vega's inconsistency regarding the

requisite qualifications for the relevant positions, and whether Sample met those qualifications.

He first contends that Vega was inconsistent in her supposed "strong preference" for local

candidates.  Though location was not a formal preference of OPM,[18] it was within Vega's

---

[17]  In fact, Sample undercuts this contention by also contending that Hidalgo played a role in the selection process for several of the positions at issue.  (*See* Pl.'s Resp. to Def.'s Statement Undisp. Mat'l Facts, ECF No. 52, at ¶¶ 43, 52).

[18]  Sample points out that the job announcements for the Kansas City and San Antonio positions did not list location as a preference, and in fact stated that travel costs could be reimbursed for applicants not living in the local areas.  (*See, e.g.*, Kansas City Announcement, attached as Ex. E to Pl.'s Resp. to Def.'s Statement Undisp. Mat'l Facts, ECF No. 52; San Antonio Announcement, attached as Ex. G to Pl.'s Resp. to Def.'s Statement Undisp. Mat'l Facts, ECF No. 52).  Moreover, the announcements for the permanent Philadelphia position also did not list location as a preference.  (*See* Philadelphia Announcement 19-002, attached as Ex. J to Pl.'s Resp. to Def.'s Statement Undisp. Mat'l Facts, ECF No. 52; Reannounced Philadelphia Position Under 19-074, attached as Ex. N to Pl.'s Resp. to Def.'s Statement Undisp. Mat'l Facts, ECF No. 52).  Nevertheless, it was within Vega's discretion to prefer candidates local to the respective branches, as she believed such familiarity would benefit the local staff and help the branches better complete their respective projects.  *See Brewer v. Quaker State Oil Refining Corp.*, 72 F.3d 326, 332 (3d Cir. 1995) (holding that courts are not "super-personnel department[s] that reexamine[] an entity's business decisions. . . . [Instead, the appropriate]

discretion, as the hiring manager, to determine that location and familiarity with the branch staff

and local projects were desirable qualifications in selecting Chapman and Barton for the Kansas

City and San Antonio positions respectively.  However, as Sample points out, Vega did not

follow this supposed "strong preference" in appointing Hidalgo as the temporary manager of the

Philadelphia branch.

Upon close inspection, there is nothing pernicious about Vega's decision to appoint

Hidalgo as temporary manager of the Philadelphia branch.  The stated reason for this choice was

that Vega perceived that NPPD was unhappy with the work product from the Philadelphia office.

Vega determined that the problems presented by this issue could only be handled by an

experienced GS-14 employee who already had considerable experience managing a branch.

Hidalgo fit the description, as she had already served in a dual role covering two branches in the

past, and she and Vega both agreed that she could handle the responsibilities.  (Vega Decl., ECF

No. 44, at ¶ 34).

In an effort to rebut Vega's proffered rationale, Sample argues that: (1) Vega was only

marginally aware of the issues NPPD supposedly complained of, and had no direct knowledge of

said issues; (2) these issues were overstated as they likely stemmed from mistakes on the part of

the NPPD personnel office, not OPM's Philadelphia office; (3) there were no documented

performance issues with the Philadelphia team on the NPPD work; and (4) Vega in fact later

assigned Sample to work with NPPD to help that customer "transition to independence."  (Resp.,

ECF No. 51, at 26-27 (citing Supp. Decl. Renel Sample, attached as Ex. M to Pl.'s Resp. to

Def.'s Statement Undisp. Mat'l Facts, ECF No. 52, at ¶¶ 1-10)).  Sample does not support any of

these contentions with evidence in the record.  Instead, his various arguments amount only to

---

inquiry is limited to whether the employer gave an honest explanation of its behavior") (quoting
*McCoy v. WGN Cont'l Broad. Co.*, 957 F.2d 368, 373 (7th Cir. 1992)).

conclusory assertions, of which he would have no personal knowledge.  *See Kirlies*, 560 F.3d at 161; *see also Trap Rock Indus., Inc.*, 982 F.2d at 890 ("[The] non-moving party may not 'rest upon mere allegations, general denials or . . . vague statements'" at the summary judgment stage) (quoting *Quiroga v. Hasbro, Inc.*, 934 F.2d 497, 500 (3rd Cir.), *cert. denied*, 502 U.S. 940 (1991)) (second alteration in original).

As a GS-13 employee, Sample would not have been privy to certain information that may have been shared with Vega, as the GS-15 SAG Program Manager.  Moreover, the fact that Sample was thereafter assigned as the GS-13 HR Specialist to aid NPPD to fix some of the issues complained of does not negate the existence of those issues nor Vega's ultimate decision to appoint Hidalgo to handle those issues.

Here, Sample has not shown that Vega's reasons for selecting Hidalgo to fill the temporary Philadelphia position—her trepidation regarding the office's prior handling of NPPD and Hidalgo's past experience stepping into a similar role—were so implausible, or suffer from such weaknesses, that they were not believable.[19]  It is not the role of this Court to litigate the prudence of Defendant's legitimate, non-discriminatory reasoning.  *See Brewer v. Quaker State Oil Refining Corp.*, 72 F.3d 326, 331 (3d Cir. 1995) ("To discredit the employer's proffered reason, the plaintiff cannot simply show that the employer's decision was wrong or mistaken, since the factual dispute at issue is whether a discriminatory animus motivated the employer, not

---

[19] Sample "must 'present evidence contradicting the *core facts* put forward by the employer as the legitimate reason for its decision.'"  *Id.* (quoting *Kautz v. Met–Pro Corp.*, 412 F.3d 463, 467 (3d Cir.2005)) (emphasis in original).  "In other words, [Plaintiff] must 'demonstrate such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them "unworthy of credence," and hence infer "that the employer did not act for [the asserted] non-discriminatory reasons."'"  *Id.* (quoting *Fuentes*, 32 F.3d at 765) (second alteration in original).

whether the employer is wise, shrewd, prudent, or competent.").

As for the permanent Philadelphia position, Sample does not advance any argument or evidence—absent his bald assertions in his declarations—to rebut Defendant's contention that each member of the interview panel ranked him the lowest candidate.  "Though job interviews are subjective, they are usually legitimate tools for picking the best candidates."  *Glaesener*, 2024 WL 4746585, at *1.  Here, absent any evidence that the panel members were acting based on discriminatory animus, courts will not presume as much.  *Id.*

Finally, Sample highlights the fact that, though he was referred for the permanent Philadelphia position during the first application period, Vega decided to arbitrarily create a "cut off" score for the set of candidates referred to her, thus eliminating Sample from the set of applicants considered.  Sample argues that this creates the inference that Vega was covering her tracks, so to speak, in a way that would mask the real motive behind her actions: discriminatory animus.  Moreover, after not selecting a candidate from the initial pool of applicants, Vega commented that none of the candidates referred to her—including Sample—were "worthy" of the position.[20]  Vega made this statement notwithstanding the fact that she thereafter acknowledged that Sample was qualified for the position.  And further, after the position was re-announced,[21] Vega decided to interview Sample.  Sample argues that this sequence of events

---

[20]  The parties disagree about whether Vega in fact made this statement.  On a motion for summary judgment, this Court views the facts in the light most favorable to the non-moving party.  *See Matsushita Elec. Indus. Co.*, 475 U.S. at 587-88.  Therefore, this Court accepts as true Sample's version of events.

[21]  The parties disagree as to whether the initial job announcement and the subsequent job announcement were sufficiently similar as to give rise to the inference that the announcements were for the "same job."  According to Defendant, because the two job announcements were different and contained varying job duties and requirements, no reasonable fact finder could draw any relevant inferences from Vega's decision not to interview Sample for the initial position, but to thereafter interview him during the second cycle.  Viewing the evidence in the light most favorable to Sample, *Matsushita Elec. Indus. Co.*, 475 U.S. at 587-88, this Court

is confusing, given that Vega would have been exceedingly familiar with his qualifications by that time, and that Vega's conduct creates the inference that Vega was acting based on discriminatory animus.

"Where, as here, a defendant has proffered a non-discriminatory reason for its actions, a plaintiff seeking to rebut a defendant's proffered reason 'must produce not simply some evidence, but sufficient evidence to support a rational finding that the legitimate, non-discriminatory reasons proffered by the defendant were false, and that *more likely than not* discrimination was the real reason for the employment action.'" *Angioletti*, 720 Fed. App'x at 46 (quoting *Weinstock v. Columbia Univ.*, 224 F.3d 33, 42 (2d Cir. 2000)) (emphasis added). Ultimately, Sample's contentions on this point simply do not rebut the "core facts" put forward by Defendant as the rationale for not selecting him. *See Tomasso*, 445 F.3d at 706. As such, Sample has not carried his burden to show that Vega's stated reasons for not selecting Sample for any of the positions were "more likely than not" pretext to hide a discriminatory animus. *Angioletti*, 720 Fed. App'x at 46; *see also Tomasso*, 445 F.3d at 706.

### C.    Sample's Retaliation Claim

Lastly, Sample advances one claim of retaliation based on his non-selection for the permanent Philadelphia position. To advance a *prima facie* case of retaliation under Title VII's

---

concludes that a reasonable fact finder could view the two job postings as sufficiently related so as to view them as the same "process."

anti-retaliation provision,[22] the plaintiff must show that: (1) he engaged in protected activity[23]; (2) the employer took an adverse employment action after or contemporaneous with the plaintiff's protected activity; and (3) a causal link exists between the plaintiff's protected activity and the employer's adverse action. *Farrell*, 206 F.3d at 279; *see also Woodson v. Scott Paper Co.*, 109 F.3d 913 (3rd Cir.1997).

Here, Sample satisfies the first two elements. He engaged in protected activity during the year leading up to Vega's decision not to select him for the permanent Philadelphia position, and Vega made that hiring decision "soon after" learning of Sample's EEOC participation. The issue here is whether a reasonable jury could find a causal link between Sample's EEOC participation and Vega's decision to hire Williams instead of him for the permanent Philadelphia position. After review of the record, this Court determines that no reasonable factfinder could find the requisite causal link.

"[T]iming and ongoing antagonism have often been the basis for [establishing a] causal link" in retaliation cases. *Farrell*, 206 F.3d at 280. Though the timing here is quite close, Sample does not point to any sort of overt antagonism against him (by Vega or any other

---

[22] Section 704(a) of Title VII, codified at 42 U.S.C. § 2000 e-3(a), sets forth Title VII's anti-retaliation provision:

> It shall be an unlawful employment practice for an employer to discriminate against any of his employees . . . because he has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter.

[23] Protected activity under Title VII's anti-retaliation provision includes EEOC participation. *Daniels*, 776 F.3d at 193 ("For purposes of the first prong of a *prima facie* case of retaliation, protected 'opposition' activity includes not only an employee's filing of formal charges of discrimination against an employer but also 'informal protests of discriminatory employment practices, including making complaints to management.'") (quoting *Curay–Cramer v. Ursuline Acad. of Wilmington, Del., Inc.*, 450 F.3d 130, 135 (3d Cir.2006)).

supervisor or co-worker). These two factors, however, are not the *only* means to establish the requisite causal link. Prior cases have also "allowed a plaintiff to substantiate a causal connection for purposes of the *prima facie* case through other types of circumstantial evidence that support the inference." *Id.* at 280-81. For instance, "[a] plaintiff may establish the connection by showing that the employer gave inconsistent reasons for [the adverse employment action.]" *Id.* at 281 (citing *Waddell v. Small Tube Products, Inc.*, 799 F.2d 69, 73 (3d Cir.1986)). In *Farrell*, the Third Circuit noted that a temporal proximity of a few weeks, coupled with an employer's inconsistent reasons for taking the adverse action, was sufficient to satisfy the third element for the purposes of summary judgment. *Id.* at 286.

Here, Sample argues that a similarly close temporal proximity exists between when Vega learned of Sample's EEOC participation related to her conduct and when she decided not to hire him. He further argues that Vega was also inconsistent with respect to her "strong preference" for local candidates, as well as her opinion of whether Sample was qualified for the relevant positions. However, as explained above, Vega's application of her preference for a local candidate was not actually inconsistent. And her perception regarding Sample's qualifications simply does not rise to the level of "contradicting the *core facts* put forward by [Vega] as the legitimate reason for [her] decision." *Tomasso*, 445 F.3d at 706 (quoting *Kautz*, 412 F.3d at 467). Having failed to present any circumstantial evidence which would establish the requisite causal link between Sample's EEOC participation and Vega's decision not to hire him for the permanent Philadelphia position, Sample's retaliation claim must fail. *See Groeber v. Friedman and Schuman, P.C.*, 555 Fed. App'x 133, 136 (3d Cir. 2014) ("[T]he 'mere fact that adverse employment action occurs after a complaint will ordinarily be insufficient to satisfy the plaintiff's burden of demonstrating a causal link between the two events.'") (quoting *Robinson v. City of Pittsburgh*, 120 F.3d 1286, 1302 (3d Cir.1997)).

**IV.    CONCLUSION**

For the foregoing reasons, Plaintiff's motion for summary judgment is granted.


BY THE COURT:


    /s/ Lynne A. Sitarski
LYNNE A. SITARSKI
United States Magistrate Judge